UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

CYNTHIA MCGRATH, Individually and as
Administratrix ad Prosequendum of the
Estate of MEGAN WRIGHT,

                          Plaintiff,                    07 Civ. 11279

        -against-                                       OPINION

DOMINICAN COLLEGE OF BLAUVELT, NEW
YORK, SISTER MARY EILEEN O'BRIEN,
Individually and as President of
Dominican College, JOHN LENNON,
Individually and as Director of
Security of Dominican College,
JOHN PRESCOTT, Individually and
as Dean of Students of Dominican
College, CARLYSLE HICKS, Individually
and as Director of Resident Life of
Dominican College, RICHARD FEGINS,
JR., KENNETH A. THORNE, JR.,
ISAIAH LYNCH, and TERRELL E. HILL,

                          Defendants.

------------------------------------X

A P P E A R A N C E S:


            Attorneys for Plaintiff

            KIRKPATRICK & LOCKHART PRESTON
              GATES ELLIS LLP
            599 Lexington Avenue
            New York, NY  10022
            By:  Andrew L. Morrison, Esq.
                 Sarah P. Kenney, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11 25 09

ALLRED, MAROKO & GOLDBERG
6300 Wilshire Blvd
Suite 1500
Los Angeles , CA 90048
By:  Gloria Allred, Esq.

SULLIVAN & WORCESTER LLP
1290 Avenue of the Americas
29th Floor
New York , NY 10104
By:  Nathan A. Goldberg, Esq.

K&L GATES LLP
599 Lexington Avenue
New York , NY 10022-6030
By:  Sarah Peck Kenney, Esq.

Attorneys for Defendants
Dominican College of Blauvelt, New York,
Sister Mary Eileen O'Brien, John Lennon,
John Prescott, and Carlysle Hicks

BIEDERMANN, REIF, HOENIG & RUFF, P.C.
570 Lexington Avenue, 16th Floor
New York, NY  10022
By:  Philip R. Semprevivo, Jr., Esq.
     Peter W. Beadle, Esq.

Attorneys for Defendant
Richard Fegins, Jr.

SAMIMI AND MURPHY
616 South Main Street
New City , NY 10956
By:  Kenneth J. Murphy, Esq.

Attorneys for Defendant
Kenneth A. Thorne

MANATT, PHELPS & PHILLIPS, LLP
7 Times Square
New York , NY 10019
By:  Arunabha Bhoumik, Esq.
     Elizabeth Murray, Esq.

Attorneys for Defendant
Isaiah Lynch _____

LEWIS BRISBOIS BISGAARD & SMITH LLP
199 Water Street
Suite 2500
New York , NY 10038
By:  Karen L. Campbell, Esq.

**Sweet, D.J.**

The defendant Dominican College (the "College")
has moved to dismiss plaintiff's Title IX, 42 USC § 1983,
fraud, and intentional infliction of emotional distress
claims against it in the Amended Complaint of the
plaintiff, Cynthia McGrath, Individually and as
Administratrix of the Estate of Megan Wright ("McGrath" or
the "Plaintiff") pursuant to Federal Rules of Civil
Procedure 9(b) and 12(b)(6) and the defendants Sister Mary
Eileen O'Brien ("President O'Brien"), John Lennon
("Director Lennon"), John Prescott ("Dean Prescott") and
Carlyle Hicks ("Resident Director Hicks") (collectively,
the "Individual Defendants" or the "College Defendants")
now have moved to dismiss the Plaintiff's Amended Complaint
in its entirety.  Upon the conclusions set forth below, the
motion of the College is denied, and the motion of the
Individual Defendants is also denied.

## Prior Proceedings

The complaint was filed by McGrath on December
14, 2007.  The Amended Complaint (the "AC") was filed on
January 29, 2008.

1

The AC alleged eight causes of action:  First
Cause of Action (Violation of Title IX against Dominican
College); Second Cause of Action (Premises Liability
against Dominican College); Third Cause of Action
(Negligence against Dominican College and Individual
Defendants O'Brien, Lennon, Prescott and Hicks); Fourth
Cause of Action (Breach of Contract against Dominican
College); Fifth Cause of Action (Intentional Infliction of
Emotion Distress against Dominican College and the
Individual Defendants); Sixth Cause of Action (Fraud
against Dominican College and Defendants); Seventh Cause of
Action (Deprivation of Federally Secured Rights against
Dominican College and Defendants; and Eighth Cause of
Action (Wrongful Death against Dominican College and, inter
alia, the Individual Defendants).

The AC alleged as follows:

McGrath is the mother of Megan Wright ("Ms.
Wright") and is both the Administratrix Ad Prosequendum and
the General Administratrix of the Estate of Megan K.
Wright.  (Am. Comp. ¶ 10).  McGrath is also Megan Wright's
sole distributee.  (Am. Comp. ¶ 10).  Ms. Wright enrolled

2

as a freshman at Dominican College for the 2005/2006 school year (Am. Comp. ¶ 11) and lived on campus during her freshman year.  (Am. Comp. ¶11).

The College is a private institution of learning that receives federal funding and is located in Orangeburg, New York.  (Am. Comp. ¶ 12).  President O'Brien was the President of Dominican College.  (Am. Comp. ¶ 13). Director Lennon was the Director of Security of Dominican College.  (Am. Comp. ¶ 14).  Dean Prescott at all times relevant to this lawsuit was the Dean of Students of Dominican College.  (Am. Comp. ¶ 15).  Resident Director Hicks at all times relevant to this lawsuit was the Director of Resident Life for Dominican College (Am. Comp. ¶ 16).

Ms. Wright matriculated as a full-time freshman student at Dominican College in late August 2005.  (Am. Comp. ¶ 23).  She was assigned to live on campus in a Residence Hall known as Hertel Hall.  (Am. Comp. ¶31). Among the documents received by Ms. Wright upon her arrival was Dominican College's Code of Conduct for its students (the "Code of Conduct").  (Am. Comp. ¶¶ 32, 33).  The Code of Conduct acknowledged Dominican College's "obligation" to

3

"protect" its students and specifically stated that
Dominican College "accepts its obligation to provide for
its members an atmosphere that protects and promotes its
educational mission and which guarantees its orderly and
effective operation."   (Am. Comp. ¶ 35).

    The Code of Conduct also states, in pertinent
part:

> Dominican College does not recognize a victim's
> signed consent, waiver, or release as an absolute
> defense to a claim of sexual assault.

(Am. Comp. ¶ 40).

    In April 2006, a female student was sexually
assaulted in a Dominican College campus Residence Hall, in
a similar manner to the subsequent attack on Ms. Wright.
(Am. Comp. ¶ 49).   Dominican College failed to investigate
this April 2006 assault.   (Am. Comp. ¶ 50).   The school's
only response was to hold a non-mandatory student meeting
that lasted no more than five minutes.   (Am. Comp. ¶ 50).
In addition, Dominican College steered the victim of that
assault to the same Orangetown police detective who would
later handle Ms. Wright's complaint.   (Am. Comp. ¶ 51).

4

This detective was severely conflicted due to his relationship with Dominican College where he was an instructor; he did not pursue either investigation.  (Am. Comp. ¶ 51).  Dominican College failed to disclose the report of the April 2006 assault in violation of federal law, including the Clery Act, 20 U.S.C. § 1092.  (Am. Comp. ¶ 53).  Based upon Dominican College's conduct in response to both the April 2006 assault and the assault on Ms. Wright, and upon information and belief, Dominican College failed to disclose other reported sexual assaults occurring on campus prior to Ms. Wright's attendance at the school. (Am. Comp. ¶ 188).

On or about May 7, 2006, Ms. Wright was raped by defendants Richard Fegins, Jr., Isaiah Lynch, and Kenneth A. Thorne, Jr. in a Resident Hall of the College.  (Am. Comp. ¶ 55).  At that time, Defendants Fegins and Lynch were students at the school and Defendant Thorne was a guest.  (Am. Comp. ¶ 55).  The attack occurred after a late night party in Ms. Wright's campus Residence Hall during which students were openly consuming alcoholic beverages in violation of school policy.  (Am. Comp. ¶ 56).  Upon leaving the party, Ms. Wright returned to her room.  (Am. Comp. ¶ 57).  Before she could open the door to her room,

5

Defendants Terrell E. Hill and Kenneth A. Thorne, Jr. (who had followed Ms. Wright from the party to her room) physically turned her around, and brought her to another room.  (Am. Comp. ¶ 57).  Defendant Thorne led Ms. Wright into the second room and raped her.  (Am. Comp. ¶ 58). Shortly thereafter, Defendants Fegins and Lynch appeared, and Defendant Thorne allowed them access to the room.  (Am. Comp. ¶ 59).  Upon entering the room, Fegins and Lynch each raped Ms. Wright.  (Am. Comp. ¶ 60).  Throughout the assault on Ms. Wright, several male students congregated outside the room where the assault was occurring.  (Am. Comp. ¶ 61).  Several students were peeking into the room when the door opened for the attackers' ingress and egress and were "high fiving" one another at various times during the assault.  (Am. Comp. ¶ 61).

While Ms. Wright was still in the room, one of the assailants exited the room and held up a white sign, which purportedly contained her signature, to the surveillance cameras so that the camera could pick up the words printed on the sign above the signature:  "I WANT TO HAVE SEX".  (Am. Comp. ¶ 62).

6

Ms. Wright awoke the next morning, May 8, 2006, believing that something was wrong. (Am. Comp. ¶66). She had a vague recollection of the events of the previous evening; she noticed that she was wearing different clothes and was sore and bleeding in the vaginal area. (Am. Comp. ¶66).

Ms. Wright asked a friend to take her to White Plains Hospital for purposes of having a rape kit and SANE[1] examination performed. (Am. Comp. ¶67). The examination confirmed that substantial injuries, including bruising and lacerations, indicated forced rape. (Am. Comp. ¶ 68). The SANE nurse on duty that day, in fifteen years of practice, had rarely seen a victim evincing more physical trauma than Ms. Wright. (Am. Comp. ¶ 69).

Ms. Wright promptly informed the College of the sexual assault that occurred on May 7, 2006. (Am. Comp. ¶ 70). Dean Prescott referred her to the Orangetown police department, but failed to mention to her that there were other campus procedures for filing complaints. (Am. Comp.

---

[1]    "SANE" is the abbreviation for Sexual Assault Nurse Examiner Program, which provides direct patient care to victims of sexual assault. Participants of SANE deliver coordinated, expert forensic and medical care necessary to increase successful prosecution of sex offenders and to assure essential medical intervention to victims of assault.

¶71).  Dean Prescott did not offer any further assistance
to Ms. Wright aside from suggesting that she obtain
counseling from the school's therapist.  (Am. Comp. ¶71).

In fact, no accommodations were made for Ms.
Wright.  (Am. Comp. ¶ 72).  The school did not reassign her
room in the Residence Halls.  (Am. Comp. ¶ 72).  The school
denied Ms. Wright's requests to take her final exams at a
different location using exam proctors.  (Am. Comp. ¶ 72).
Despite her attempts to do so, Ms. Wright was unable to
take her final exams.  (Am. Comp. ¶ 73).

Ms. Wright repeatedly sought assistance from the
College only to be told that the College would neither take
any action nor conduct its own independent investigation
until the conclusion of the criminal investigation
undertaken by the Orangetown police department.  (Am. Comp.
¶ 74).

It took over a month from the date of the attack
for Dean Prescott to view the security videotape taken from
the Residence Hall.  (Am. Comp. ¶ 75).  This tape showed
Ms. Wright being followed into a Residence Hall room, the
entrance into that room by her three alleged assailants,

8

and the presence of another group of men gathered outside
the door of that room.  (Am. Comp. ¶ 75).  Ms. Wright and
her mother, McGrath, met with the Dean Prescott in June and
were told that Ms. Wright's complaint would be "difficult
to prove."  (Am. Comp. ¶ 76).  Dean Prescott discouraged
Megan from pursuing a complaint through the school.  (Am.
Comp. ¶ 76).

     The College directed Ms. Wright to pursue the
criminal investigation with a detective in the Orangetown
police department who, unbeknownst to Ms. Wright at the
time, was employed by Dominican College as an instructor.
(Am. Comp. ¶ 78).  She met with the detective on or about
May 15, 2006, after her final exams period.  (Am. Comp.
¶80).  She gave the detective the underwear and other
articles of clothing that she had worn during the night of
the rape; those items included samples of her blood.  (Am.
Comp. ¶ 80).  The detective interviewed Ms. Wright alone
for approximately 20 minutes.  (Am. Comp. ¶80).

     Although the detective promised to report the
results of a preliminary investigation within 10 days,
neither Ms. Wright nor McGrath heard from the detective
over the following few weeks.  (Am. Comp. ¶ 81).  During

9

its alleged "investigation," the police department did not investigate the room where Ms. Wright alleged she was attacked. (Am. Comp. ¶ 82). When asked why the Police department did not investigate the room, the detective told McGrath that "they only do that on TV". (Am. Comp. ¶ 82). The Police department did not treat that room as a crime scene. (Am. Comp. ¶ 82). Nor did they gather any evidence from that room. (Am. Comp. ¶ 82). No one from the Orangetown police department visited that room in connection with any investigation of Ms. Wright's allegations. (Am. Comp. ¶ 82).

The detective failed to contact either Ms. Wright or McGrath for weeks during the summer of 2006. (Am. Comp. ¶ 83). Concerned by this sustained period of silence, McGrath called the detective. (Am. Comp. ¶ 83). During that call, the detective asked to meet with Ms. Wright and McGrath. (Am. Comp. ¶ 83). When they later met, the detective viewed with Ms. Wright and her mother the surveillance videotape taken from the Residence Hall on the night of the attack. (Am. Comp. ¶ 83).

The detective at that time indicated that he was aware of another reported sexual assault that occurred on

campus in April 2006.  (Am. Comp. ¶ 84).  The detective was
aware of the April 2006 assault because the school had
steered the victim of that assault to him.  (Am. Comp. ¶
85).

    After the attack on Ms. Wright, one of the
alleged assailants had – on his own volition – visited the
office of the Orangetown police department to claim that he
had consensual sex with Ms. Wright and indicated that she
had printed the sign "I WANT TO HAVE SEX" and signed it
prior to the assault.  (Am. Comp. ¶ 90).  The detective
took a writing sample from Ms. Wright by asking her to
write on a similarly sized piece of paper the words:  "I
WANT TO HAVE SEX."  (Am. Comp. ¶ 86).  The detective
retained this sample from Ms. Wright.  (Am. Comp. ¶ 86).
In his police report, the detective later indicated that
his refusal to investigate the assault was due, at least in
part, to the fact that he believed that Ms. Wright's
handwriting matched the writing on that sign.  (Am. Comp. ¶
86).  Neither the police nor the school made a finding
about whether Ms. Wright was compelled or threatened to
write on the sign, whether any of her assailants held or
forced her hand or whether Ms. Wright possessed a competent
mental state to knowingly give her consent.

In June 2006, McGrath and Ms. Wright met with
Dean Prescott at Dominican College.  (Am. Comp. ¶ 92).  At
that time, he indicated that the police investigation was
proceeding but no independent school investigation had
occurred.  (Am. Comp. ¶ 92).  Dean Prescott conceded that
he still had not viewed the hallway videotape and that he
had not conducted any interviews with the alleged
assailants.  (Am. Comp. ¶ 92).  He indicated that he was
awaiting additional information from the detectives at the
Orangetown police department.  (Am. Comp. ¶ 92).

McGrath asked Dean Prescott if the alleged
assailants would be suspended from school.  He indicated
that there would be no such suspensions.  (Am. Comp. ¶ 93).
McGrath informed him that Ms. Wright would have to withdraw
from school due to fear for her safety.  (Am. Comp. ¶ 93).

After the meeting with Dean Prescott, McGrath and
Ms. Wright requested a meeting with President O'Brien.
President O'Brien refused to meet with either McGrath or
Ms. Wright.  (Am. Comp. ¶ 94).  The College never
communicated either a written or verbal report of any
investigation to either McGrath or Ms. Wright.  (Am. Comp.

12

¶ 95).  Ms. Wright and her mother told Dean Prescott that
Ms. Wright was fearful of another attack if she returned to
school.  The College offered no accommodation.  (Am. Comp.
¶ 96).  Ms. Wright did not return to campus for the fall
semester of the 2006/2007 school year.  (Am. Comp. ¶ 97).

Ms. Wright took her own life in December 2006 in
her own bedroom with her mother and brother in the house.
(Am. Comp. ¶ 104).

The instant motions seeking dismissal of the AC
were made on January 29, 2008, and the reply memorandum was
filed on April 10, 2008.  Oral argument was heard on
October 30, 2008.  The action was reassigned to this court
on June 5, 2009.

## The Applicable Standards

### A.  Rule 9(b)

Rule 9(b), Fed. R. Civ. P., provides that "[i]n
all averments of fraud or mistake, the circumstances
constituting fraud or mistake shall be stated with
particularity. Malice, intent, knowledge, and other

13

condition of mind of a person may be averred generally."
Id. The Second Circuit "has read Rule 9(b) to require that
a complaint [alleging fraud] '(1) specify the statements
that the plaintiff contends were fraudulent, (2) identify
the speaker, (3) state where and when the statements were
made, and (4) explain why the statements were fraudulent.'"
Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting
Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.
1993)). See, e.g., Ouaknine v. MacFarlane, 897 F.2d 75, 79
(2d Cir. 1990), cert. denied, 502 U.S. 921, 112 S. Ct. 332,
116 L.Ed.2d 272 (1991); Cosmas v. Hassett, 886 F.2d 8, 11
(2d Cir. 1989); Center Savings & Loan Association v.
Prudential-Bache Securities Inc., 679 F. Supp. 274, 277
(S.D.N.Y. 1987).

Rule 9(b) is designed to ensure that a defendant
is informed sufficiently of the allegations against him
such that he is in a position to answer the complaint and
prepare a defense. Klein v. Computer Devices, Inc., 591
F.Supp. 270, 279 n.27 (S.D.N.Y. 1984), accord Spear, Leeds
& Kellogg v. Public Service Co. of New Hampshire, 700 F.
Supp. 791, 793 (S.D.N.Y. 1988) (complaint was sufficient
because it gave "fair and reasonable notice to defendants
of the claim and the grounds upon which it is based, thus

14

satisfying one of the main purposes of Rule 9(b)"); Conan
Properties, Inc. v. Mattel, Inc., 619 F. Supp. 1167, 1173
(S.D.N.Y. 1985) ("[d]efendant is on sufficient notice of
what [plaintiff] is charging").

In the Second Circuit, the pleading standard for
scienter is satisfied "'(a) by alleging facts to show that
defendants had both motive and opportunity to commit fraud,
or (b) by alleging facts that constitute strong
circumstantial evidence of conscious misbehavior or
recklessness.'" Ganino v. Citizens Utilities Co., 228 F.3d
154, 168-69 (2d Cir. 2000) (quoting Shields v. Citytrust
Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994)).

### B. Rule 12(b)(6)

On a motion to dismiss pursuant to Rule 12, all
factual allegations are accepted as true, and all
inferences are drawn in favor of the pleader. Mills v.
Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).
The issue "is not whether a plaintiff will ultimately
prevail but whether the claimant is entitled to offer
evidence to support the claims." Villager Pond, Inc. v.

15

Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting

Scheuer v. Rhodes, 416 U.S. 232, 235-36 (1974)).


However, while the pleading standard set forth in

Rule 8 of the Fed. R. Civ. P. is a liberal one,

> the pleading standard Rule 8 announces . . .
> demands more than an unadorned, the-defendant-
> unlawfully-harmed-me accusation. A pleading that
> offers labels and conclusion or a formulaic
> recitation of the elements of a cause of action
> will not do. Nor does a complaint suffice if it
> tenders naked assertions devoid of further
> factual enhancement.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal

cites and quotes omitted). Thus, a complaint must allege

sufficient factual matter to "state a claim to relief that

is plausible on its face." Id. (quoting Bell Atlantic

Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In meeting

this "plausibility standard," the plaintiff must

demonstrate more than a "sheer possibility" of unlawful

action; pleading facts that are "'merely consistent with' a

defendant's liability . . . 'stops short of the line

between possibility and plausibility of entitlement to

relief.'" Id. (quoting Twombly, 550 U.S. at 557); see also

Reddington v. Staten Island Univ. Hosp., 511 F.3d 126, 131

(2d Cir. 2007) ("Although the pleading standard is a

liberal one, bald assertions and conclusions of law will
not suffice.  To survive dismissal, the plaintiff must
provide the grounds upon which his claim rests through
factual allegations sufficient to raise a right to relief
above the speculative level." (internal quotes and cites
omitted)); Gavish v. Revlon, Inc., No. 00-CV-7291, 2004 WL
2210269, at *10 (S.D.N.Y. Sept. 30, 2004) ("[B]ald
contentions, unsupported characterizations, and legal
conclusions are not well-pleaded allegations and will not
defeat a motion to dismiss.").


**The Allegation of Deliberate Indifference Under Title IX is
Adequate**


In pleading a cause of action under Title IX (see
20 U.S.C. §§ 1681-1688), the First Cause of Action of the
Amended Complaint has alleged that Dominican College failed
to implement policies and procedures related to the
handling of reports of sexual assault as required by Title
IX.


Title IX provides, in pertinent part:


17

No person in the United States shall, on the
basis of sex, be excluded from participation in,
be denied the benefits of, or be subject to
discrimination under any education program or
activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Title IX is enforceable through an implied
private right of action seeking monetary damages.  See
Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 65, 76
(1992).  Sexual harassment is considered discrimination in
the school context under Title IX, and a plaintiff may
recover for student on student harassment, if the plaintiff
can demonstrate four elements:

(1)  defendant is a Title IX funding recipient;

(2)  an appropriate person has actual knowledge
of the discrimination or harassment the plaintiff alleges
occurred;

(3)  the funding recipient has acted with
deliberate indifference to known acts of harassment; and

(4)  the discrimination is so severe, pervasive
and objectively offensive that it effectively bars the
victim's access to an educational opportunity or benefit.

See Williams v. Bd. of Regents of the Univ. Sys. of
Georgia, 477 F.3d 1282, 1293 (11th Cir. 2007). Courts will
find deliberate indifference where a plaintiff demonstrates
that the school's response to the harassment or its lack of
response is "clearly unreasonable in light of the known
circumstances." Davis v. Monroe County Bd. of Educ., 526
U.S. 629, 648 (1999).

          The College has contended that the Plaintiff has
failed to allege a Title IX violation as a matter of law.
(Dominican Def. Br. at 1). To support this argument, the
College contended that the Amended Complaint's Title IX
claim is predicated upon "two distinct scenarios for
liability: (1) that the College failed to prevent the
sexual assault on Ms. Wright by showing a deliberate
indifference to alleged prior sexual assaults; and (2) that
the College failed to implement policies and procedures
related to the handling of reports of sexual assault as
required by Title IX." (Dominican Def. Br. at 1-2).

          However, the AC alleges that the College violated
Title IX because it was deliberately indifferent to Ms.
Wright's complaint after the attack occurred. According to
the Plaintiff, the AC does not allege that the College

                              19

violated Title IX because it "failed to prevent the sexual assault on Ms. Wright by showing a deliberate indifference to alleged prior sexual assaults" (as stated in the College Memorandum in Support) but rather that the College had actual notice of the student on student harassment reported by Ms. Wright, that Ms. Wright reported the incident to school officials immediately after her attack, and that the College acted with deliberate indifference after it was aware of the sexual harassment reported by Ms. Wright.

The first two elements of a Title IX violation, that the College is a recipient of federal funding and that "appropriate" persons at the College have actual knowledge of Ms. Wright's complaint are not disputed.  The College has challenged the allegation of the third element, whether the AC alleges deliberate indifference.  Relying upon Oden v. Northern Marianas College, 440 F.3d 1085 (9th Cir. 2006), the College has contended that to allege successfully deliberate indifference, McGrath must allege that the College deliberately attempted to sabotage Ms. Wright's complaint or its orderly resolution.  Id. at 1089, Dominican Def. Br. at 4.

Oden involved a student's complaint of sexual
harassment against her music professor.  Id. at 1087.  The
court - on a motion for summary judgment and not on a
motion directed at the pleading - found that the facts
presented did not support a finding of deliberate
indifference.  Id. at 1089.  Specifically, the court found
that:

> The College began to act as soon as it became
> aware of Plaintiff's allegations.  Two counselors
> were assigned to Plaintiff to provide
> psychological and practical support; they met
> with her more than a dozen times; they assisted
> her in filing a formal complaint; and they helped
> her drop Dalla Pozza's class immediately.  After
> the complaint was filed, the College served it on
> Dalla Pozza.  He was instructed not to have any
> contact with Plaintiff.  Eventually a hearing
> took place, Plaintiff was believed, and Dalla
> Pozza was significantly disciplined.

Id.  The plaintiff had alleged that a nine-month delay in
convening a hearing violated Title IX.  Id.  The court
found that there were reasons for the school's delay,
including allowing time for plaintiff to retain a lawyer
and allowing for delay caused by plaintiff's relocation to
New Mexico.  Id.  The court held:  "[w]e need not and do
not decide that a delay never can constitute deliberate
indifference; we decide only that this record does not

21

permit an inference that the delay was a deliberate attempt to sabotage plaintiff's complaint or its orderly resolution." Id. (emphasis in original). The Oden court relied on the factual record before it and did not hold that a plaintiff has to demonstrate a deliberate attempt to sabotage a harassment complaint in order to demonstrate a violation of Title IX.

The standard for deliberate indifference is whether the school failed to act reasonably under the circumstances. See Davis, 526 U.S. at 648 (finding recipients are deliberately indifferent "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances"). In Vance v. Spencer County Public School District, 231 F.3d 253 (6th Cir. 2000), the defendant - similar to the Individual Defendants here - argued "as long as a school district does something in response to harassment, it has satisfied [its burden under the deliberate indifference] standard." Id. at 260. The United States Court of Appeals for the Sixth Circuit explicitly rejected this standard and held:

> If this Court were to accept [the school's]
> argument, a school district could satisfy its
> obligation where a student has been raped by
> merely investigating and absolutely nothing more.
> Such minimalist response is not within the
> contemplation of a reasonable response.

Id.

The AC has alleged that the Individual Defendants refused to take any action, by deferring to a criminal investigation. The College's failure to act in deference to the police "investigation" may prove to be actionable. See Mills Pub. Sch. Dist., OCR Case No. 01-93-1123 (Dep't. of Educ. May 19, 1994) ("The District had an obligation to enact a grievance procedure which would result in prompt and equitable resolution of the sexual harassment complaints, regardless of any criminal process."); Acad. Sch. Dist. No. 20, OCR Case No. 8-93-1023 (Dep't. of Educ. April 16, 1993) (holding where school district "decided to defer to the criminal investigation undertaken by the Sheriff's Department" that the school district was obligated to conduct an investigation and make its own determination if a violation of Title IX has occurred notwithstanding the existence of a related criminal investigation).

The Individual Defendants have not challenged the
Plaintiff's allegations with respect to denial of an
educational opportunity under Title IX.  The AC has alleged
that Ms. Wright faced three separate acts of sexual
violation on the night of the attack, that conduct was
severe, pervasive and objectionably offensive conduct was
alleged by a student who was sexually molested by one
student and raped by another student at the same time and
in the same room immediately after she had consensual sex
with a third student).  The AC has also alleged that Ms.
Wright and her mother, the Plaintiff, attempted to engage
the College administrators in a dialogue during the summer
to discuss accommodations that would allow Ms. Wright to
feel comfortable about attending the College in the fall
and that the College failed to engage them in any
meaningful discussions or take steps to ameliorate the
discrimination and that Ms. Wright could not safely return
to school in the fall, where two of her three attackers
were still enrolled.  See Murrell v. Sch. Dist. No. 1,
Denver, Colo., 186 F.3d 1238, 1248-49 (10th Cir. 1999)
(holding with "little difficulty" the allegations that, due
to sexual harassment, plaintiff became a danger to herself

and had to leave school to be hospitalized demonstrated
that plaintiff had been deprived of education benefits).

         The College relies upon Gebser v. Lago Vista
Independent School District, 524 U.S. 274 (1998) for the
proposition that there is no recovery in damages for a
violation of administrative requirements.  Id. at 291-92;
College Def. Memo in Support at 6.  In Gebser, the school
district had no actual knowledge of the sexual harassment
of a student by a high school teacher.  The plaintiff thus
attempted to establish liability by the school district's
failure to "promulgate and publicize" an effective policy
and grievance procedure.  See Gebser, 524 U.S. at 291.  The
court did not address failure to "follow" procedures and
held that, standing alone, a "failure to promulgate a
grievance procedure does not itself constitute
'discrimination.'"  Id. at 292.  Here, the AC has alleged
far more than a failure to promulgate procedures and sets
forth in detail the College's actual knowledge and
deliberate indifference.

         The AC has adequately alleged that the College
was deliberately indifferent as unreasonable in light of
the known circumstances.

                          25

## The § 1983 Claim is Adequately Alleged

42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any
> State or Territory, subjects, or causes to be
> subjected, any citizen of the United States or
> other person within the jurisdiction thereof to
> the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action
> at law, suit in equity, or other proper
> proceeding for redress.

To state a claim under § 1983, a plaintiff must show that
(1) defendants acted under color of law so as to (2)
violate a federal right of the plaintiff.  Adickes v. S.H.
Kress & Co., 398 U.S. 144, 150 (1970).

The Act has alleged two primary factors with
respect to the action of the College under color of law.
The College:  (1) received federal funding (Am. Comp. ¶¶
12, 119, 200) and (2) the College delegated its
investigative responsibilities to the Orangetown Police
department through a police detective who was also an
employee of the College.  (Am. Comp. ¶¶ 199, 201; see id.
at ¶¶ 1, 6, 51, 70-71, 74-75, 77-79, 92, 123, 178).

26

The Individual Defendants have contended that no § 1983 liability attaches to them without factual allegations that their conduct was "coerce[d] or encourage[d]" by the State.  (Memo in Support at 16). However, the AC has alleged that the Individual Defendants acted under color of law by collaborating with the local police detective who was also their employee to conceal reports of sexual assaults, including the attack on Ms. Wright and the prior April 2006 assault (Am. Comp. ¶¶ 50, 51, 79, 85, 199, 201).  These allegations of collaboration with a government actor are sufficient to allege that the Individual Defendants acted under color of state law.  See Friedman v. New York City Admin. For Children's Servs., No. 04-CV-3077, 2005 WL 2436219, at *8-*9 (E.D.N.Y. Sept. 30, 2005) (denying a motion to dismiss a § 1983 claim against defendant Cohen where plaintiff alleged that Cohen, a private doctor, provided the Administration for Children's Services with false and malicious information that caused curtailment of plaintiff's child visitation privileges).

The AC has alleged that the Defendants were "jointly engaged with state officials in the challenged action", Coakley v. Jaffe, 49 F. Supp. 2d 615, 624

27

(S.D.N.Y. 1999), and thus were acting under color of law for § 1983 purposes. Id.; Dennis v. Sparks, 449 U.S. 24, 27-28 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970). (See Am. Comp. ¶¶ 199, 201). In Coakley, the court held that plaintiff had stated a § 1983 claim against private actors based upon allegations that these defendants convinced a local assistant district attorney to conduct a "flawed investigation" that led to an alleged deprivation of plaintiff's federal rights. Coakley, 49 F. Supp. 2d at 620. The court held that these allegations sufficiently set forth the element that defendants acted under color of law. Id. at 624.

Neither Blum v. Yaretsky, 457 U.S. 991 (1982) nor Rendell-Baker v. Kohn, 457 U.S. 830 (1982) cited by the Defendants involved collaboration between a defendant and a state official, such as has been set forth in the AC.

Ms. Wright had a federal right to a non-discriminatory police investigation. See Daniels v. City of Binghamton, No. 95-CV-688, 1998 WL 357336, at *5 (N.D.N.Y. June 29, 1998) ("Courts have recognized section 1983 equal protection claims based upon discriminatory failures by public officials to conduct proper

28

investigations."); Eagleston v. County of Suffolk, 790 F.
Supp. 416, 421-22 (E.D.N.Y. 1992) (upholding § 1983 claim
against police based on equal protection for failure to
investigate violation of protective order reported by
plaintiff); see also DeShaney v. Winnebago County Dep't. of
Social Servs., 489 U.S. 189, 197 n.3 (1989) (noting that
the Equal Protection Clause is violated when a State
selectively denies protective services to a certain
disfavored minority).

Defendants violated Megan's right to equal
protection when they collaborated with the Orangetown
police detective to undertake an investigation of Ms.
Wright's complaint of sexual assault which has been alleged
to be a cover-up and sham.  (Am. Comp. ¶¶ 42, 82, 86, 92,
98, 110, 139, 148, 175, 178, 213).

The AC has alleged personal involvement in the
deprivation of this right by the Individual Defendants.  In
Back v. Hastings on Hudson Union Free School District, 365
F.3d 107 (2d Cir. 2004), a case cited by the Defendants,
the Second Circuit set forth several methods by which
personal involvement may be established under § 1983.  The
Back Court explained, in pertinent part:

29

> Personal involvement [in a § 1983 deprivation]
> can be shown by:  evidence that . . . the
> defendant[s], after being informed of the
> violation through a report or appeal, failed to
> remedy the wrong . . . or [] the defendant
> exhibited deliberate indifference . . . by
> failing to act on information indicating that
> unconstitutional acts were occurring.

Id. at 127.  The AC has alleged that:  (1) each of the

Individual Defendants is alleged to have failed to remedy

the wrongs done to Ms. Wright, despite their knowledge of

the tainted police investigation (Am. Comp. ¶¶ 1, 5, 8, 51,

53, 71-72, 74-49, 87, 91-96, 101-103, 199-201); and (2)

each of the Individual Defendants is alleged to have

exhibited deliberate indifference to Ms. Wright by taking

part in the scheme to use a local police detective to

"bury" Ms. Wright's complaint of sexual harassment.  (Am.

Comp. ¶¶ 51, 71, 74-79, 92, 110, 123, 178).


Monell v. Dep't. of Social Servs., 436 U.S. 658

(1978) cited by the Defendants, concerned the vicarious

liability of municipalities for § 1983 claims under a

theory of respondeat superior and concluded that, standing

alone, such theory was insufficient to create liability.

Id. at 691.  Monell required a showing that the conduct of

30

the individuals reflected a "policy" adopted by the municipality in order to hold the municipality vicariously liable for acts of those individuals. Id. at 692. Back v. Hastings On Hudson Union Free School District, 365 F.3d 107 (2d Cir. 2004) cited by the Defendants, found personal involvement by defendants in an employment discrimination action when they recommended denying plaintiff tenure and evaluated plaintiff negatively. Id. at 125. Sanders v. Sears, Roebuck & Co., 984 F.2d 972 (8th Cir. 1993) also cited by the Defendants, involved a § 1983 claim asserted against the company on the basis of an act of a security guard at one of its many stores, see id. at 973-74, as opposed to the allegations here that the College's administrators engaged in a pattern of conduct designed to effectively dispose of - rather than address - sexual harassment claims that were potentially embarrassing or harmful to the school. See Turpin v. Mailet, 619 F.2d 196, 199-201 (2d Cir. 1980) (failure to take action on the part of those in senior policy making roles constituted "an official policy within the meaning of Monell") (internal quotation omitted). (Am. Comp. ¶¶ 1, 42, 71, 74-79, 82-83, 85, 92, 98, 101, 110, 123, 175, 178, 199. 201, 213). Finally, McKinnon v. Patterson, 568 F.2d 930 (2d Cir. 1978) cited by Defendants, did not involve a motion to dismiss

but, rather, involved the evaluation of evidence after entry of a judgment upon trial.  See id. at 935.

    The AC has adequately alleged a § 1983 claim.

## The Fraud Allegations Are Adequately Alleged

    According to the Defendants, the AC fails to identify a specific fraudulent statement relied upon by Ms. Wright.  The Defendants note that FRCP 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity" and that the Plaintiff must set forth the "who, what, when, and where" of the alleged fraud.  United States ex rel. Barmak v. Sutter Corp., No. 95-CV-7637, 2003 WL 21436213, at *4 (S.D.N.Y. 2003).  The Defendants have noted that N.Y.C.P.L.R. 3016(b) likewise requires that in all claims alleging fraud, the circumstance allegedly constituting fraud must be stated in detail.

    The Plaintiff has conceded that the fraud which she has alleged related to the inducement to enroll for the 2005-2006 school year.  At issue is the adequacy and

32

particularity of the allegations in the AC made on
information and belief.

The AC has alleged certain facts to support each
element of its fraud claim including those alleged upon
information and belief.  In April 2006, the month before
the attack on Ms. Wright, another female student was
sexually assaulted in the College's on-campus Residence
Hall, an attack that was inadequately disclosed and dealt
with (Am. Comp. ¶ 49).  There were other attacks reported
to the Individual Defendants (Am. Comp. ¶ 188).  Defendants
failed to disclose any of these attacks (Am. Comp. ¶ 50,
53, 103, 188, 191-93).  Information about sexual assaults
on campus would have had an impact on the decision of
prospective students, including Ms. Wright, to apply for
admission and enroll as students at the College (Am. Comp.
¶¶ 192-93).  It is alleged that the Defendants intended to
misrepresent the safety of the school's campus in order to
induce students to enroll there (Am. Comp. ¶¶ 191, 193),
and that  Ms. Wright justifiably relied on this
misrepresentation of campus safety when she decided to
enroll and live on campus (Am. Comp. ¶ 194) and was injured
as a result (Am. Comp. ¶ 196).  According to the Plaintiff,
the AC has satisfied the requirements set forth in Fed. R.

33

Civ. P. 9(b) relying upon IUE AFL-CIO Pension Fund v.
Herrmann, 9 F.3d 1049, 1057 (2d Cir. 1993) (restating the
rule that "[d]espite the generally rigid requirement that
fraud be pleaded with particularity, allegations may be
based on information and belief when facts are peculiarly
within the opposing party's knowledge.") (internal citation
omitted).

According to the Plaintiff, the Defendants have
not recognized that New York law imposes on the College
Defendants a duty to disclose information regarding campus
crime because Defendants have superior knowledge of this
essential information and that a party, such as the
Individual Defendants here, has a duty to speak when he:
(i) possesses superior knowledge, (ii) not readily
available to the other and, (iii) knows that the other is
acting on the basis of mistaken knowledge. See, e.g., P.T.
Bank Central Asia, 301 A.D.2d 373, 377, 754 N.Y.S.2d 245,
251 (fraudulent concealment claim survived motion to
dismiss because plaintiff satisfied these three elements).

The AC alleges that the Individual Defendants had
superior knowledge of sexual assaults occurring on campus
because they, exclusively, received reports of such

34

assaults from the victims (Am. Comp. ¶¶ 190-91) and had a further distinct duty to disclose known unsafe conditions. In New York "a failure to disclose the existence of a known danger may be the equivalent of misrepresentation, where it is to be expected that another will rely upon the appearance of safety." McKinney v. Bellevue Hosp., 183 A.D.2d 563, 565, 584 N.Y.S.2d 538, 540 (1st Dep't. 1992 (citing Prosser, Torts § 33, at 179 (4th ed.)) (denying the defendant's motion to dismiss a fraud claim that was predicated on the defendant employer's failure to inform its plaintiff-employee of a tumor found in X-rays the defendant performed on plaintiff during a pre-employment health screening).

Under IUE Pension Fund v. Herrmann, cited above, the allegations of prior knowledge of prior similar assaults based on knowledge and belief arising out of the treatment of the April and May, 2006 assaults, narrowly satisfy the Rule 9(b) requirements of particularity.

**The Claim for Intentional Infliction
of Emotional Distress is Adequately Alleged**

To state a claim for intentional infliction of emotional distress, a plaintiff must plead:

> (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress.

Wait v. Beck's North Am., Inc., 241 F. Supp.2d 172, 180-81 (N.D.N.Y. 2003).

The Defendants have contended that this claim should be dismissed because it is duplicative and because it fails to allege either intent or outrageous conduct on behalf of the Individual Defendants.  At this point of the litigation, it is uncertain whether damages to be awarded against the Individual Defendants under a theory of intentional infliction of emotional distress will overlap the damages to be awarded for the other claims asserted in the AC.  Accordingly, the claim is not duplicative and should not be dismissed.  See Bender v. City of New York, 78 F.3d 787, 793-94 (2d Cir. 1996).  In Bender, the Second Circuit upheld a jury verdict awarding damages for intentional infliction of emotional distress, false arrest and malicious prosecution.  That Court recognized that the

36

damages overlapped between those causes of action, but it allowed recovery under all three claims because of the possibility that the damages did not entirely overlap.  Id.

The Defendants also argue that the AC fails to allege actual intent. (Memo in Opp. p. 8). However, the AC alleges that the Defendants' conduct with respect to Ms. Wright's complaint that she had been raped by three different men "was sufficiently insensitive as to intentionally cause Ms. Wright to suffer severe emotion distress. . . ." (Am. Comp. ¶¶ 177, 179). Accordingly, the AC has alleged the element of intent. See Wait v. Beck's North Am., Inc., 241 F.Supp.2d 172, 180-81 (N.D.N.Y. 2003) (upholding intentional infliction of emotional distress claim because plaintiff had alleged facts sufficient to apprise defendants of the nature of her claim).

The Defendants have contended that the conduct alleged in the AC was not extreme and outrageous. (Memo in Opp. at 7-8). However, the cases cited in support of that argument do not involve facts similar to those present here where it is alleged that the College refused to investigate allegations of a rape and directed the alleged victim to a

37

police detective who was also a school employee.  (Am.
Comp. ¶¶ 199, 201; see id. at ¶¶ 1, 51, 71, 74-75, 77-79,
92, 123, 178).

Whether the reliance upon a police investigation
conducted by an officer who was an employee of the College
was outrageous conduct exceeding human decency must be
considered a jury issue under these circumstances.  Where
it is alleged that an impartial investigation was subverted
and where such an investigation might have established
whether or not Ms. Wright did consent or had the capacity
to consent, an interrelationship between the allegedly sham
investigation and Ms. Wright's suicide may constitute
requisite outrageous conduct.

In light of the foregoing authorities and
conclusions, the Defendants' motion to dismiss is denied.

It is so ordered.

November 2J, 2009

ROBERT W. SWEET
U.S.D.J.